**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James B. SANTILLANES, Defendant–Appellant.**

**No. 87–1870.**

United States Court of Appeals, Tenth Circuit.

June 9, 1988.

---

Paul J. Kennedy, Albuquerque, N.M., for defendant-appellant.

Stephen R. Kotz, Asst. U.S. Atty. (William L. Lutz, U.S. Atty., James Tierney and Joe M. Romero, Jr., Asst. U.S. Attys., on the brief), Albuquerque, N.M., for plaintiff-appellee.

Before SEYMOUR and SETH, Circuit Judges, and O'CONNOR, District Judge *.

SETH, Circuit Judge.

This is an appeal of the trial court's denial of appellant's motion to suppress evidence seized and statements made during a stop of appellant at an airport by two city police officers. Appellant was indicted and entered a conditional plea of guilty reserving the right to appeal the denial of his motion to suppress. Appellant was sentenced May 22, 1987 to seven years imprisonment with a three year mandatory supervised release.

Detective Haury of the Albuquerque Police Department had received a tip that a felon (not appellant) would be arriving at the Albuquerque Airport. While the detective was at the airport with another officer he saw appellant leave the Southwest Airlines lobby and boarding area, a place within the airport security, and enter the main lobby of the airport. A Southwest flight from California had just arrived. Officer Haury recognized appellant from an arrest in which the officer participated a month earlier for appellant's possession of heroin with intent to distribute, an offense for which he was under indictment.

* Honorable Earl E. O'Connor, Chief United States District Judge for the District of Kansas, sitting by designation.

Although Detective Haury did not know the details of appellant's pretrial release his impression was that individuals who have been indicted for a felony were not permitted to leave Bernalillo County. Based on this impression he testified that he decided to stop and question appellant to find out if appellant had violated the conditions of his pretrial release. This was his reason for the stop. Such a violation of conditions of release is not a crime in New Mexico but a matter to be resolved by a judge when made known to him or to her.

The detective called out to appellant and upon hearing his name, while walking out of the boarding area and seeing Detective Haury, appellant looked away, veered away and started to walk at an increased pace. The detective who was armed and who is six feet four and weighs 350 pounds reached out and placed his hand on appellant's shoulder to stop him. Appellant in contrast is five feet ten and weighs some 200 pounds less than the officer. Appellant stopped and Detective Haury, after identifying himself, asked appellant what he was doing. Appellant responded: "You know what I am doing." Both the officers immediately "patted him down" for weapons. Detective Haury testified that the reason for so doing was that this was his "standard procedure" when he is questioning an individual he has previously arrested or has been in contact with during an investigation. No mention was made that they considered appellant armed or dangerous. No weapons were discovered, but the officers continued. Both reached in appellant's pockets one officer on one side and the other on the other side. One found a roll of money and the other a beer can. This took place in the main lobby of the airport near the entrance to a gift shop. There were a considerable number of people around, and appellant requested that if the detectives were going to continue that it be done in a private room rather than the public lobby.

The men moved to a nearby airport security office where the officers continued their search with appellant ordered to lean forward with hands against the wall or locker with feet apart. This was apparent-ly done twice. Detective Haury described this procedure as a "narcotics pat-down", as does the Government, but the term is not defined. In any event, above appellant's waistband in the front the officers felt a lump, reached in and removed a plastic bag containing what was later determined to be heroin. The detective then formally arrested appellant.

Detective Haury testified, as mentioned, that he initially stopped appellant on the "leaving the jurisdiction" question, but *after* stopping him he suspected appellant was carrying narcotics. He interpreted appellant's question, "Who snitched me off?", made after the search continued in the security room, according to the trial court's findings, as referring to narcotics rather than to a violation of bail. It is apparent that immediately after the stop to question appellant and after one or two questions, "What are you doing?", and without a real answer the thorough search began expressly for narcotics which, as mentioned, is referred to as a "narcotics pat-down." The testimony of the detective and appellant demonstrated the appellant was at no time free to leave after the initial stop.

A federal grand jury indicted appellant for one count of possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1). Prior to trial appellant filed a motion to suppress the evidence and statements made during the stop and arrest. An evidentiary hearing was held and the trial court denied the motion.

It is apparent from the record, as mentioned, that appellant was not free to leave after the initial stop and a thorough search began immediately. As mentioned, the appellant was being searched and things taken from his pockets in the lobby area before he asked to be taken to a less public place.

The trial court, after a reference to the pre-existing charges against defendant, to the officers' knowledge of "matters involving criminal conduct" by defendant, and to the time and place he was seen in the airport, found:

"And that based upon his previous knowledge of the defendant and knowing that he was not permitted to leave Bernalillo County, he detained the defendant.

"And I think these facts constitute the basis under Terry versus Ohio, that permits a contemporary detention in order to justify an investigative stop."

Also, the court here found:

"But in any event, he—the initial pat-down was merely for the search of weapons to protect himself and the other officer and this is also permissible under the law.

"Then after—during the weapons pat-down, the defendant requested to be taken to a—an area outside of the view of the public. And at that point, he made the statement, 'Who snitched me off,' at which time then Officer Haury believed that there was something in addition to the weapons search. At that point he made a pat-down for narcotics and he found the narcotics, at which time he advised the defendant of his rights."

The trial court also found that defendant was not in "custody" "until such time as the heroin was found," but as above stated found he was "detained."

Appellant contends that the trial court did not from the facts reach the correct legal conclusion and that his Fourth Amendment right to be free from unreasonable searches and seizures was violated. We identified in *United States v. Cooper*, 733 F.2d 1360, 1363, (10th Cir.), and again in *United States v. Espinosa*, 782 F.2d 888, 890 (10th Cir.), three types of encounters between citizens and the police and the constitutional protections provided for each encounter.

"The first is referred to as a police-citizen encounter and is characterized by the voluntary cooperation of a citizen in response to non-coercive questioning. This has been held to raise no constitutional issues because this type of contact is not a seizure within the meaning of the Fourth Amendment....

"The second type of encounter is the *Terry*-type of stop. The standards here are set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Most courts characterize this as a 'brief, non-intrusive detention during a frisk for weapons or preliminary questioning * * *.' This is considered a seizure of the person within the meaning of the Fourth Amendment, but need not be supported by probable cause. In order to justify an investigatory stop, the officer need have only 'specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime.'

"The final category is an arrest which is characterized by highly intrusive or lengthy search or detention. An arrest is justified only when there is probable cause to believe that a person has committed or is committing a crime." (Citations omitted.)

■ In the instant case, the encounter between appellant and the detective cannot be characterized as the voluntary cooperation of a citizen in response to noncoercive questioning. On the contrary, the detective physically restrained appellant to stop and question him. The officer at the evidentiary hearing admitted that if appellant had refused to cooperate and responded "I'm not stopping I'm going on" that he "probably would have detained him." Another officer participated. In reviewing the record we cannot find that the initial encounter between appellant and the detective was voluntary and the questioning noncoercive. Appellant had no choice but to stop and respond to Officer Haury's questions. He testified that he was afraid by reason of a previous violent encounter with Detective Haury.

The Supreme Court in *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, stated:

"We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards."

The record shows that the officer physically stopped and detained appellant. Appellant was seized and did not voluntarily consent to the search or questioning by both officers.

We are thus left with a consideration of this as a *Terry* stop. In *United States v. Recalde*, 761 F.2d 1448, 1454 (10th Cir.), this court discussed when a *Terry* type stop is appropriate. We held:

> "*Terry* permits police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause. In order to justify an investigative stop, an officer need have only a reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity. In evaluating the reasonableness of an investigative stop, courts are to examine
>
> > 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'
>
> This assessment of reasonableness is essentially a balancing test. As the Supreme Court has noted:
>
> > '... We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. *When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests,* the opposing law enforcement interests can support a seizure based on less than probable cause.' " (Emphasis supplied, citations omitted.)

■ The Government maintains that Detective Haury initially stopped appellant for the purpose of inquiring whether or not appellant had violated or was going to violate the conditions of his release and the court so found. Appellant contends that *Terry* authorizes limited governmental intrusions for the purpose of investigating a person who has been, is, or is about to be engaged in criminal activity, and that a violation of a Metropolitan Court condition of pretrial release is not a crime under New Mexico law. Appellant points to the court rules to illustrate what he characterizes as the remedies for a violation of conditions of release. These provide that the court on its own motion or upon motion of the prosecuting attorney may at any time have the defendant arrested to review conditions of release. Thus when an individual violates a condition of release the court may have the person arrested, but there is no provision stating that a violation is a crime. It is apparent if there is a violation, it is a matter to be brought to the court's attention. At the most Detective Haury should have reported seeing the appellant at the particular place in the airport when he had identified him. We do not find *United States v. Williams*, 622 F.2d 830 (5th Cir.), helpful in the resolution of these issues as urged by both parties as it was there decided, with the admission that the defendant had left the jurisdiction and with this departure being a crime, an arrest was there proper. However, in the case before us since there was no crime involved in the possible departure of appellant from the jurisdiction the reason advanced by the Government and the detective for the initial stop was not valid, and the initial patdown and questions were in violation of appellant's rights. There would seem to be no serious question but that Officer Haury could have properly made the initial inquiry, "What are you doing here?", had the appellant's stop and participation been voluntary, but it was not.

■ If there were two stops, one for questioning about leaving the jurisdiction, which failed, and a stop within that stop on the narcotics suspicion testified to by the officer as a reason which apparently developed during the encounter, the second cannot be sustained as a *Terry* stop because the *Terry* initial purpose requirement cannot be met.

The appellant had already been searched while in the lobby area, the search continued in the security office and the appellant's question, "Who snitched me off?", the trial court found was made in the se-

curity area. Despite the finding, there was testimony that it may have been made before. This question by appellant was considered by the officer and the Government the key element of the narcotics suspicion and which triggered it. However, considering the sequence of events it came too late to support the officers' suspicion which theretofore was based only on appellant's criminal record and appellant's actions at the time and place where appellant was encountered. These factors were certainly not enough. The question-statement was also one made while appellant was detained in a room from which he could not leave and had been detained before that. It was in a custodial setting although appellant had not yet been formally arrested. In these circumstances, and considering again the sequence of the events, we cannot conclude that the actions of the two officers were "minimally intrusive" on appellant's Fourth Amendment rights.

■ Appellant also contends that the detective exceeded the scope of the *Terry* exception when he patted him down for weapons because such a pat-down was not supported by a reasonable suspicion that he was armed and presently dangerous. In *United States v. Sporleder*, 635 F.2d 809, 814 (10th Cir.), we identified what grounds are necessary to support a *Terry* type frisk:

"[T]he officers must show that their pat-down was 'supported by a reasonable belief that [defendant] was armed and presently dangerous, a belief which ... must form the predicate to a patdown of a person for weapons.' Also, '[n]othing in *Terry* can be understood to allow a generalized "cursory search for weapons" or, indeed, any search whatever for anything but weapons.'" (Citations omitted.)

The Government asserts that the detective patted appellant down for weapons for his own safety and for the safety of the other people in the lobby. The trial court agreed with this assertion. After reviewing the record we are unable to conclude that the initial pat-down was conducted for the officers' protection and must hold that

the finding was contrary to the record and an abuse of discretion. Appellant was observed entering the main lobby from the Southwest gate area. The gate area is a secured part of the airport. Appellant obviously had at some point successfully passed through a metal detector to gain entry to the gate area. There is nothing in the record to show the requisite reasonable belief that appellant was armed and presently dangerous to form the predicate to a pat-down for weapons. Again, the only reason for the pat-down for weapons stated by the officer was: "[T]hat is standard procedure for me, Sir, when I'm interviewing somebody that I had arrested previously or had been in contact in an investigation to pat him down for possible weapons." While this may be the officer's routine practice it does not constitute a valid reason as it ignores the fact that a pat-down must be based on the officer's reasonable belief that the person stopped is armed and presently dangerous.

In *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238, police officers while executing a search warrant at a tavern, advised the customers that they were going to conduct a cursory search for weapons. During the pat-down of Ybarra the officer felt a cigarette pack. After completing the pat-downs of the other patrons, the officer went back to Ybarra and frisked him again. This time the officer found heroin. The Court found that the state was unable to articulate any facts from which the officer could have suspected Ybarra was armed and presently dangerous. Consequently, the Court held:

"The initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons....

"The *Terry* case created an exception to the requirement of probable cause, an exception whose 'narrow scope' this Court 'has been careful to maintain.' Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or sus-

pects are then in the possession of the person he has accosted.... Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons. The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked...."

*Ybarra* at 92–94, 100 S.Ct. at 343 (citations omitted).

This court applied *Ybarra* in *United States v. Sporleder*, 635 F.2d 809 (10th Cir.), and again in *United States v. Ward*, 682 F.2d 876 (10th Cir.). In both cases we have required that the Government show that the initial frisk was supported by a reasonable suspicion that the defendant was armed and presently dangerous. In the absence of this showing, the search is not constitutional.

██ Furthermore, the search for weapons should be a limited intrusion. The Supreme Court in *Sibron v. New York*, 392 U.S. 40, 65, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917, noted that "[t]he search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault." In the instant case, the detective went beyond patting appellant's outer clothing. He reached into appellant's pockets where he discovered a beer can and a roll of money. The detective's conduct in this case cannot be considered minimally intrusive. The actions of Detective Haury and the other officer exceeded the scope of a permissible frisk and consequently violated appellant's Fourth Amendment rights.

Finally, appellant contends the pat-down for weapons was used by the detective as a discovery device so that the detective could continue searching for the narcotics he suspected appellant of possessing. The Government contends that the detective had prior to the pat-down probable cause to believe appellant was in possession of narcotics. This belief, the Government urges, was based upon appellant's conduct after the stop and the background knowledge and experience of the officer. For example, the detective was an experienced narcotics investigator familiar with the techniques used by drug smugglers; he had participated in an arrest of appellant a month earlier for a heroin related offense; when the officer called out to stop appellant, he veered away five to six feet and increased his pace; once he was stopped he paled, appeared nervous and broke out in beads of sweat. The Government argues that probable cause is measured against an objective standard. The facts and circumstances must warrant a prudent man in believing that an offense has been or will be committed; more specifically, probable cause must be evaluated in relation to the circumstances as they would have appeared to a prudent, cautious and trained police officer. *United States v. Lopez*, 777 F.2d 543, 551 (10th Cir.).

After reviewing the record we cannot find that the searches were supported by probable cause. The officer at most had a mere suspicion that appellant might be in possession of narcotics based on his record and the time and place. As the trial court indicated, appellant's "who snitched me off" statement could relate to the violation of the conditions of release he was subject to. The statement can be interpreted to mean, who told you that I was leaving town. In any event, the statement (or question) was made during defendant's detention in the security room. As the trial court found, there was "temporary detention" and the statement was made following the "investigative stop" although there was no "custody" until the narcotics were found. Moreover, appellant's nervousness and attempt to avoid Detective Haury could be attributed to his prior violent encounter with the officer.

Based on the facts in the record and those found by the trial court, we must disagree with the trial court's application of the law as hereinabove described.

Thus the case must be remanded with directions to grant appellant's motion to suppress. IT IS SO ORDERED.