(119 P.3d 1171)
No. 92,580

STATE OF KANSAS, *Appellee,* v. BILLY D. ANDERSON, *Appellant.*

Opinion filed September 16, 2005.

*Philip R. White*, of Ariagno, Kerns, Mank & White L.L.C., of Wichita, for appellant.

*Charles L. Rutter*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Phill Kline*, attorney general, for appellee.

Before GREEN, P.J., HILL and CAPLINGER, JJ.

GREEN, J.: Billy Anderson appeals from his convictions of possession with the intent to sell methylenedioxymethamphetamine (MDMA) in violation of K.S.A. 65-4163(a) and failure to affix a tax stamp to a controlled substance in violation of K.S.A. 79-5204. The issue raised by Anderson on appeal is whether the trial court erred in denying his motion to suppress evidence. The State raises two arguments as to why Anderson's motion was properly denied. The State maintains that officers had reasonable suspicion of drug activity to detain Anderson and that suspicion ripened into probable cause to arrest Anderson for illegal drug activity. We disagree. Nevertheless, we do agree that the totality of the circumstances here led the officers to reasonably suspect Anderson of illegal drug activity. As a result, the officers were justified in detaining Anderson after the traffic stop investigation had been completed to further investigate their suspicion of illegal drug activity. Nevertheless, once the officers discovered no evidence or information implicating Anderson in any illegal drug activity, the officers were no longer justified in continuing their detention of Anderson. Any further detention of Anderson at that point could only be justified by probable cause or consent, and the officers had neither.

The State also argues that there was reasonable suspicion to detain Anderson for a suspected parole violation and that the subsequent arrest for the violation was properly based on an arrest and detain order under K.S.A. 2004 Supp. 75-5217(a). We again disagree. A plain reading of K.S.A. 2004 Supp. 75-5217(a) reveals that a law enforcement officer is deputized with the authority to arrest an individual who has allegedly committed a parole violation when that officer has been given the written arrest and detain order detailing the violation. Because the officers in this case had not been given the written arrest and detain order before arresting Anderson, they lacked authority to make the arrest. Moreover, because a parole violation is not a crime, the suspected parole violation would not have furnished to the officers reasonable suspicion jus-

tifying a *Terry* stop and detention. Because the continued detention and arrest of Anderson was unlawful, the seized evidence should be suppressed in this case. As a result, we determine that the trial court erroneously denied Anderson's motion to suppress. Accordingly, we reverse.

Anderson's convictions in this case stem from events that occurred on July 30, 2003. On that date, Officer Brad Elmore was surveilling a Wichita Amoco station where the cashier, Umanah Smith, had been arrested the year before for possession of cocaine and marijuana. During the past several years, Elmore had made more than 20 drug-related arrests of individuals leaving the Amoco station. Moreover, the police had received numerous complaints about drug activity occurring at the Amoco station.

While Elmore was observing the Amoco station in an unmarked car on July 30, he saw Anderson drive into the parking lot and enter the station. Anderson was wearing red and white which were colors that Elmore knew were worn by Bloods gang members. Elmore thought that Anderson might be contacting Smith because he knew that gang members are commonly involved in drug activity and that Smith was a Bloods gang member who was involved in drug activity. Samuel Cobos, a documented Vato Loco Boy gang member, was with Anderson and went inside the station with him. Elmore's partner had received information in the past that Cobos was involved in drug activity.

While Anderson and Cobos were inside the Amoco station, Elmore ran the tag on Anderson's truck and discovered that it was from Enterprise Leasing. It had been Elmore's experience that individuals involved in drug activity commonly use rental cars to conduct their dealings.

Approximately 5 minutes after Anderson and Cobos entered the Amoco station, they came out, got back inside the truck, and drove out of the parking lot. Elmore noticed that Anderson was carrying a sack when he left the station. Although Elmore stated that it was uncommon to see people leaving with sacks from the Amoco station, he did not find it suspicious. Apparently, the Amoco station was also a convenience store that sold various food items.

When Anderson and Cobos left the Amoco station, Elmore followed them in his unmarked car to the parking lot of an apartment complex. Elmore noticed that four Hispanic men who were standing in the parking lot gathered around Anderson's truck when it stopped. Elmore drove around the parking lot to find a suitable place to park and watch the truck. Nevertheless, the truck was gone by the time Elmore got to the other side of the parking lot. Elmore then saw Anderson's truck exiting the parking lot. Elmore thought that possibly a drug transaction had occurred based on the short amount of time during which the meeting took place, as well as the number of people involved. In Elmore's past experience, a lot of individuals conduct drug transactions in parking lots around other people because it does not look so suspicious and because it is safer than going into someone's home.

After Anderson left the parking lot of the apartment complex, he drove back to the Amoco station. Anderson went inside the Amoco station for a couple of minutes, returned to his truck with a different individual than had been with him the first time, and drove away from the Amoco station. As Elmore was following directly behind Anderson's truck, he noticed that Anderson increased his speed. Elmore's speedometer registered 50 miles per hour in a 35-mile-per-hour zone. In addition, Elmore noticed Anderson's truck cross the solid yellow line and drive on the left side of the line for a "couple" of hundred feet.

Based on his observations, Elmore radioed other officers in the area to stop Anderson for these traffic violations. Officer Eddy Padron, who was traveling in a marked police car, heard Elmore's request and stopped the truck at approximately 10:35 p.m. Officer Daniel McFarren, as well as another officer, arrived shortly thereafter.

Upon approaching the truck, Padron advised Anderson that he was being stopped for a traffic violation. Padron obtained the driver's licenses of both Anderson and the passenger, Cornell Golston. Moreover, Padron obtained the rental agreement from Anderson and determined that everything was in order. McFarren spoke with Golston and asked what he and Anderson were doing. Golston told McFarren that he and Anderson were getting some

food. McFarren noticed that Golston was eating crackers and sardines and that there was a white plastic bag containing food in the truck.

While running a warrants check and a driver's license check, Padron was informed that both Anderson and Golston were documented gang members and that Anderson was on supervised release. Nevertheless, the checks revealed that there were no arrest warrants for either Anderson or Golston and that Anderson's driver's license was valid.

Before returning to Anderson's truck, Padron spoke with McFarren who related that he had previously stopped Anderson for traffic violations, that Anderson had denied consent to search, and that Anderson might be involved in drug activity. Actually, McFarren had previously stopped Anderson on two occasions. Approximately 1 week before the July 30 incident, McFarren stopped Anderson for traffic violations. At that time, McFarren had received information from another officer that narcotics detectives were looking into Anderson's activities relating to narcotics trafficking. In addition, McFarren had stopped Anderson several months before the July 30 incident but had not discovered any illegal drugs. During that stop, McFarren learned that Anderson was carrying $4,000 on his person.

After learning the information from McFarren, Padron told McFarren to contact their sergeant to have a drug dog sent to their location. Padron then returned to the truck, asked Anderson to step outside of the truck, and conducted a pat-down search. Padron indicated that he conducted the pat down because he knew that gang members usually carry guns for protection. Padron did not find any weapons on Anderson.

After conducting the pat-down search, Padron had Anderson sign the traffic citation. In addition, Padron returned Anderson's and Golston's driver's licenses. After Anderson signed the citation and was given a copy, Padron then asked Anderson for consent to search the truck. When Anderson denied consent, Padron told Anderson that a drug dog was on its way and directed Anderson to the sidewalk. Padron admitted that Anderson was not free to go at that point.

Padron then asked Golston to step out of the truck. While performing a pat-down search, Padron noticed there was a baggie sticking out of Golston's shoe. When Padron asked Golston about the baggie, Golston replied, "That's just a little bit of weed, man." Padron pulled the baggie out of Golston's shoe and discovered that it contained marijuana. Padron then placed Golston under arrest. During a more thorough search, Padron found narcotics pills in Golston's other shoe, as well as over $1,300 on Golston's person.

A detective eventually arrived with a drug dog which alerted on the truck. The officers then searched the truck but did not find anything of evidentiary value. According to Padron, during the time that the dog and the search were taking place, Officer Faustino Naldoza was attempting to contact a parole officer to determine if Anderson could be arrested for a parole violation. Nevertheless, according to Naldoza, he did not attempt to contact a parole officer until after the search produced nothing of evidentiary value. In fact, Naldoza's report indicated that after nothing was found inside the truck, the officers decided to contact the Kansas Department of Corrections (KDOC) Parole Enforcement to try and obtain an arrest and detain order for Anderson. Naldoza made several phone calls but was unable to contact a parole officer. Padron then contacted Richard Sackhoff who was a special enforcement officer for the KDOC but was not Anderson's parole officer.

Padron explained to Sackhoff that they had stopped Anderson who was on supervised release and was flagged as a gang member and that Anderson had been with Golston who was in possession of marijuana and was also a gang member. According to Sackhoff, he verified that Anderson was on parole and told Padron that he was issuing an arrest and detain order and that officers could take him into custody. Sackhoff told Padron that he would leave a copy of the arrest and detain order in the front door of his home for an officer to pick up. The arrest and detain order introduced at the hearing was dated July 31, 2003.

After Padron received the oral authorization from Sackhoff, the officers decided around 11:48 or 11:49 p.m. on July 30 to take Anderson into custody under the arrest and detain order. When officers approached Anderson and tried to arrest him, Anderson

fled. Officers pursued Anderson, found him hiding underneath a truck in a construction area, and arrested him. During the chase, one of the officers saw Anderson trying to get rid of some plastic baggies near a trash dumpster. These baggies contained blue pills and crushed powder. A baggie containing a similar substance was found in Anderson's shoe after he was arrested. Testing indicated that the recovered substance contained MDMA, commonly referred to as ecstasy.

In August 2003, Anderson was charged with possession of MDMA with intent to sell and failure to affix a tax stamp to a controlled substance. In October 2003, Anderson moved to suppress the drug evidence. Anderson argued that the detention after the issuance of the traffic citation violated the Fourth Amendment to the United States Constitution and was not reasonably related in scope to the traffic violation. Anderson maintained that any evidence discovered by the officers must be suppressed as "fruit of the poisonous tree."

The State responded to Anderson's motion to suppress, arguing that the officers had reasonable suspicion to detain Anderson after the initial traffic stop because they suspected Anderson possessed narcotics. Moreover, the State contended that based upon the totality of the circumstances, the officers had a particularized and objective basis to believe Anderson was in violation of his supervised release. The State maintained that the search of Anderson followed a lawful arrest and that some of the seized drug evidence had been abandoned by Anderson during the chase.

The trial court conducted an evidentiary hearing on Anderson's motion to suppress. At the conclusion of the hearing, the trial court found that once the warrants checks came back negative, the traffic stop had concluded. Nevertheless, once Padron discovered that Anderson was on parole, he had probable cause to believe that Anderson had violated his parole by being with Golston and Cobos. The trial court noted that although an arrest and detain order did not exist at the time of the traffic stop, it was not unreasonable for Padron to detain Anderson until such an order existed.

Moreover, the trial court found that the duration of the stop was not unreasonable and that the officers proceeded in a diligent and

expeditious manner. The trial court noted that once a search of the truck discovered no drugs, the officers tried to contact a parole officer to get an arrest and detain order. The trial court stated that although Sackhoff was not Anderson's parole officer, he had the authority to issue an arrest and detain order based upon the information that was provided. The trial court determined that there was no problem in the law with an oral authorization to arrest and detain. The trial court denied Anderson's motion to suppress.

The case proceeded to a bench trial on stipulated facts. Anderson preserved for appeal the trial court's decision on his motion to suppress. The trial court found Anderson guilty of possession of MDMA with intent to sell and of failure to affix a tax stamp. Anderson was sentenced to a controlling term of 40 months in prison.

*Standard of Review*

On appeal, Anderson argues that the trial court erred in failing to suppress drug evidence that was seized during an unlawful search and seizure. When reviewing a motion to suppress evidence, the appellate court determines whether the factual underpinnings of the trial court's decision are supported by applying a substantial competent evidence standard. However, the ultimate legal conclusion drawn from those facts is a legal question requiring the appellate court to apply a de novo standard of review. The appellate court does not reweigh the evidence. *State v. Vandervort*, 276 Kan. 164, 169, 72 P.3d 925 (2003). Moreover, we must remember that the State bears the burden of proof for a suppression motion. It must show to the trial court the lawfulness of the search and seizure. *State v. Boyd*, 275 Kan. 271, 273, 64 P.3d 419 (2003).

*Search and Seizure*

The Fourth Amendment to the United States Constitution prohibits all searches and seizures that are unreasonable, " ' "and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' [Citation omitted.]" ' " *State v. Jaso*, 231 Kan. 614, 620, 648 P.2d 1 (1982). "The general rule that warrantless searches and seizures

are unreasonable has five exceptions: (1) consent; (2) hot pursuit; (3) incident to a lawful arrest; (4) stop and frisk; and (5) probable cause to search with exigent circumstances." *State v. Boyd*, 275 Kan. at 273-74.

*State's Theories*

The State advances two theories as to why the drug evidence was properly seized by a search incident to a lawful arrest; was abandoned property and not protected under the Fourth Amendment to the United States Constitution; or was subject to inevitable discovery by the officers. First, the State maintains that the officers had probable cause to detain Anderson for the suspected parole violation and that the subsequent arrest was properly based on the issuance of a written arrest and detain order under K.S.A. 2004 Supp. 75-5217(a). Alternatively, the State argues that irrespective of any determination of a parole violation, the trial court properly admitted the drug evidence because the officers had reasonable suspicion to stop and frisk Anderson and this suspicion ripened into probable cause to arrest Anderson for illegal drug activity. We will address the State's alternative argument first.

*Reasonable Suspicion of Drug Activity*

It is undisputed in this case that Padron initially stopped Anderson for traffic violations. A traffic stop constitutes a seizure under the Fourth Amendment to the United States Constitution. *State v. DeMarco*, 263 Kan. 727, 733, 952 P.2d 1276 (1998). Under the holding in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), an officer may stop any person in a public place when there are specific and articulable facts creating a reasonable suspicion that the person has committed or is about to commit a crime. *State v. Slater*, 267 Kan. 694, 696-97, 986 P.2d 1038 (1999). The Fourth Amendment search and seizure principles expressed in *Terry* have been codified in K.S.A. 22-2402(1). *Slater*, 267 Kan. at 697.

We recognize that an officer has the right to stop a car whose driver has committed a traffic violation and can briefly detain the occupants of the car for the purpose of enforcing the traffic laws

of this state. *State v. Schmitter*, 23 Kan. App. 2d 547, 551, 933 P.2d 762 (1997). When conducting a routine traffic stop, a law enforcement officer may request the driver's license and car registration, conduct a computer check, and issue a citation. If no information is found during the computer check, the person must be allowed to leave without further delay. To justify a further detention for questioning on matters unrelated to the initial stop, the officer must have reasonable suspicion that the person has committed, is committing, or is about to commit some other crime. *Schmitter*, 23 Kan. App. 2d 547, Syl. ¶ 5.

Here, the traffic stop concluded once the warrants check came back negative and Padron issued the citation. The question is whether the officers had gained a reasonable and articulable suspicion of criminal activity at this point that would justify the continued detention of Anderson. Anderson maintains that he should have been free to leave after he was handed the citation as the officers did not possess reasonable suspicion to further detain him. The State, however, argues that the officers possessed a reasonable and articulable suspicion that drug activity was afoot and, therefore, could have lawfully stopped him based upon those observations. We note that the trial court made no finding that the officers had reasonable suspicion of drug activity to further detain Anderson.

In *United States v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989), the United States Supreme Court stated the following regarding reasonable suspicion:

"The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' [Citation omitted.] The Fourth Amendment requires 'some minimal level of objective justification' for making the stop. [Citation omitted.] That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means 'a fair probability that contraband or evidence of a crime will be found,' [citation omitted] and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause."

Moreover, quoting from *Alabama v. White*, 496 U.S. 325, 330, 110 L. Ed. 2d 301, 110 S. Ct. 2412 (1990), our Supreme Court in *Slater*, 267 Kan. at 697, set forth the following standard for determining whether reasonable suspicion exists:

" 'Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. . . . Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture" [citation omitted] that must be taken into account when evaluating whether there is reasonable suspicion.' "

"What is reasonable is based on the totality of circumstances and is viewed in terms as understood by those versed in the field of law enforcement." *State v. Toney*, 253 Kan. 651, 656, 862 P.2d 350 (1993).

In determining " 'the reasonableness of an investigative detention, we make a dual inquiry, asking first "whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." ' [Citations omitted.]" *State v. Mitchell*, 265 Kan. 238, 241, 960 P.2d 200 (1998).

In the instant case, at the conclusion of the traffic stop, the officers had the following information: Anderson, along with documented gang member Cobos, had been at the Amoco station where there was suspected drug activity and there had been numerous arrests of individuals leaving the station; the Amoco station's cashier was a documented Bloods gang member and had been convicted the previous year for possession of drugs; after leaving the Amoco station, Anderson went momentarily to the parking lot of an apartment complex where his truck was immediately surrounded by four Hispanic men; Anderson drove back to the Amoco station and then left the station with Golston who was a documented gang member; Anderson was driving a rental car; Anderson was wearing Bloods gang colors and was a documented gang member; Anderson was on parole; Elmore had observed Anderson speeding and driving left of the center line; during a previous stop, McFarren had learned that Anderson was carrying $4,000 on his person; and McFarren previously received information that nar-

cotics detectives were looking into Anderson's activities relating to narcotics trafficking.

We believe that the combination of the above factors would cause an officer to be reasonably suspicious of drug activity in this case and would warrant further detaining Anderson. Importantly, an officer "does not have to *know* that the defendant committed a crime. Merely pointing to some facts that would cause a reasonable person to be suspicious is enough to conduct a *Terry* stop." *State v. Finley*, 17 Kan. App. 2d 246, 251, 838 P.2d 904, *rev. denied* 251 Kan. 940 (1992). Although the officers had not observed any unlawful conduct by Anderson, they were able to point to several facts which would cause a reasonable person to suspect that possible drug activity was taking place. Therefore, the officers were justified in detaining Anderson after the conclusion of the traffic stop.

Nevertheless, our inquiry does not end there. As discussed above, we must also determine whether the detention " ' "was reasonably related in scope to the circumstances which justified the interference in the first place." ' [Citations omitted.]" *Mitchell*, 265 Kan. at 241. Before Padron even returned to Anderson's truck to issue a citation, the officers decided to summon a drug dog to sniff around Anderson's truck. Such action was appropriate as the officers had suspicions of drug activity, and it was reasonable to call out a drug dog that could sniff around the truck and either dispel or confirm the officers' suspicions quickly. See *United States v. Sharpe*, 470 U.S. 675, 686-88, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985) (stating that in assessing whether detention is too long to be justified as an investigative stop, the court may appropriately examine whether police diligently pursued means of investigation that likely would confirm or dispel suspicions).

Upon returning to the truck, after giving back Anderson's and Golston's identifications and giving Anderson a copy of the citation, Padron asked Golston to step out of the car and patted him down. Padron indicated that he asked Golston to step out of the car because he knew that the detective bringing the drug dog would not want any occupants in the car. Additionally, Padron indicated that he did the pat-down search because he knew that gang members usually carry guns for protection. In *State v. Waddell*, 14 Kan. App.

2d 129, Syl. ¶ 1, 784 P.2d 381 (1989), this court recognized: "In order to justify a 'stop and frisk' search under *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), and K.S.A. 22-2402, a police officer must reasonably believe that his or her personal safety is at risk." Because the traffic stop had escalated to a detention based on reasonable suspicion of drug activity and because Padron knew that Golston was a gang member and might be carrying a gun, it was reasonable for Padron to pat down Golston when he was asked to step out of the car.

After Padron discovered a baggie sticking out of Golston's shoe during the pat-down search, Golston admitted that it contained marijuana. Golston was then arrested, and the officers also found narcotics pills and over $1,300 in cash on his person. Thereafter, the drug dog arrived and alerted to Anderson's truck. The officers then searched Anderson's truck but found nothing of evidentiary value.

At this point, the officers' reasonable suspicions that Anderson was involved in drug activity should have lessened. The officers had pursued a method of investigating the suspected drug activity that did not produce anything which would point to Anderson. The search of the truck did not produce any incriminating evidence. Although officers had discovered drugs and money on Golston, they found no incriminating evidence which would indicate that Anderson could be linked to these items. As noted in *State v. Morris*, 276 Kan. 11, 25, 72 P.3d 570 (2003), "[a] person's mere propinquity to others independently suspected of criminal activity does not, without more, authorize a *Terry* stop unless the officer has reasonable suspicion directed specifically at that person." When the officers failed to discover drugs in the truck, the officers had no reasonable basis for continuing their detention of Anderson, and they should have released him. The continued detention of Anderson after the officers failed to discover drugs in the truck became unreasonable. It is apparent that the officers' continued detention of Anderson was based on a hunch. Nevertheless, as stated previously, reasonable suspicion cannot rest upon the hunch of an experienced officer, even if that hunch turns out to be right. See *United States v. Sokolow*, 490 U.S. at 7. As a result, we deter-

mine that at that point the officers' continued detention of Anderson became an unlawful detention.

*Probable Cause to Arrest Anderson*

Nevertheless, assuming arguendo that the officers had reasonable suspicion to continue the detention of Anderson, this suspicion never ripened into probable cause giving officers the authority to arrest Anderson.

K.S.A. 2004 Supp. 22-2401(c)(1) authorizes a law enforcement officer to arrest an individual without a warrant if the officer has probable cause to believe that the individual is committing or has committed a felony. " 'Probable cause exists where "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. [Citation omitted.]' " *State v. Abbott*, 277 Kan. 161, 164, 83 P.3d 794 (2004) (quoting *Draper v. United States*, 358 U.S. 307, 313, 3 L. Ed. 2d 327, 79 S. Ct. 329 [1959]). "In determining whether probable cause to arrest exists, all the information in the officer's possession, fair inferences therefrom, and facts may be taken into consideration that might not be admissible on the issue of guilt." *State v. Payne*, 273 Kan. 466, Syl. ¶ 4, 44 P.3d 419 (2002).

The State argues that the following circumstances had the effect of ripening the officers' level of suspicion to probable cause to believe that Anderson was involved in drug activity: the drugs and $1,300 discovered on Golston, the drug dog's alert on the truck, Anderson's attempt to abscond from the scene, and Anderson's attempt to throw out the baggies of drugs. The State maintains that at a minimum, there was probable cause to believe that Anderson was aiding and abetting Golston.

We do not endorse the State's attempt to bootstrap Anderson's flight from the officers and his action of discarding the drugs into the factors giving the officers probable cause to believe that Anderson was involved in drug activity. As noted in 2 LaFave, Search and Seizure § 3.2(d) (4th ed. 2005), when a warrantless arrest is made, "the information to be considered is the 'totality of facts'

available to the officer *at the time of the arrest or search."* (Emphasis added.) Here, Anderson did not flee the scene and discard the drugs until after the officers had attempted to arrest him. Therefore, these factors are not relevant in determining whether the officers had probable cause to arrest Anderson.

Thus, the remaining factors that the State argues had the effect of ripening the officers' suspicions to the level of probable cause are: (1) the drugs and $1,300 that were found on Golston; and (2) the drug dog's alert on the truck. Nevertheless, when the search of Anderson's truck did not produce anything, this should have dispelled the officers' suspicions pertaining to the drug dog's alert on the truck. Moreover, if the officers possessed reasonable suspicion of Anderson being involved in drug activity, this suspicion should have been lessened after the search of Anderson's truck produced nothing. It is also important to note that officers did not discover anything during the pat-down search of Anderson. It is inconceivable to determine that after the search of Anderson's truck produced no drug evidence, the officers' reasonable suspicion increased to the level of probable cause.

Furthermore, the fact that Golston had drugs and money on his person does not show that Anderson was guilty of drug activity. Noting that the search or seizure of a person must be supported by probable cause particularized to that person and cannot be avoided by simply pointing out that there is probable cause to search or seize another person, the United States Supreme Court in *Ybarra v. Illinois*, 444 U.S. 85, 91, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979), stated:

"[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. *Sibron v. New York*, 392 U.S. 40, 62-63, 20 L. Ed. 2d 917, 88 S. Ct. 1889 (1968). Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the 'legitimate expectations of privacy' of persons, not places. [Citations omitted.]"

Here, there was no incriminating evidence discovered during the detention that would indicate that Anderson had drugs on his person or which would link the evidence found on Golston to Anderson.

The United States Supreme Court's decision in *United States v. Di Re*, 332 U.S. 581, 92 L. Ed. 210, 68 S. Ct. 222 (1948), provides further support for the conclusion that the drugs and money found on Golston, a passenger in Anderson's truck, did not give the officers probable cause to arrest Anderson. In that case, an informant told an investigator with the Office of Price Administration that he was going to buy counterfeit gasoline ration coupons from one Buttitta at a designated place. The investigator and a detective followed Buttitta's car to the designated place. The officers found the informant in the back seat holding the counterfeit ration coupons. The informant told the officers that he had bought the coupons from the driver, Buttitta. Di Re was a passenger in the car. The officers arrested all three occupants of the car. At the police station, when Di Re was asked to empty the contents of his pockets and later when he was searched, it was discovered that he had possession of counterfeit ration coupons.

The *Di Re* Court's opinion turned on whether there was probable cause to arrest Di Re. The Government attempted to defend Di Re's arrest on the theory that there were probable cause to believe he was guilty of conspiracy. Nevertheless, the Court found that the facts of the case did not warrant an inference of participation in conspiracy. The Court noted that there was no evidence establishing that Di Re was in the car when the informant obtained the coupons from Buttitta or that Di Re overheard or participated in any conversation on the matter. The Court further noted that the meeting occurred in a public street in a large city in broad daylight in plain sight of bypassers and that it did not necessarily involve a visibly criminal act. Moreover, the Court stated that "whatever suspicion might result from Di Re's mere presence seems diminished, if not destroyed, when Reed, present as the informer, pointed out Buttitta, and Buttitta only, as a guilty party." 332 U.S. at 594.

Like the facts of *Di Re*, here there was a singling out or incrimination of the other occupant of the car, Golston, to the exclusion of Anderson. At the time of Anderson's arrest, the officers had no information that would implicate or point to Anderson. Moreover, after the search of the car revealed no incriminating evidence, the officers had nothing to link Anderson to the drugs that were found on Golston, that is, to show that Anderson and Golston were involved in a common enterprise of drug activity. Therefore, the officers lacked probable cause to arrest Anderson.

*Parole Violation*

We now come to the State's argument that the officers had probable cause to detain Anderson for the suspected parole violation and that the subsequent arrest was properly based on the issuance of a written arrest and detain order under K.S.A. 2004 Supp. 75-5217(a).

In order to address the parties' arguments on this issue, we must interpret K.S.A. 2004 Supp. 75-5217(a), which authorizes the arrest of an individual who has violated a condition of parole, conditional release, or postrelease supervision. "Interpretation of a statute is a question of law, and an appellate court's review is unlimited. An appellate court is not bound by the district court's interpretation of a statute. [Citation omitted.]" *State v. Maass*, 275 Kan. 328, 330, 64 P.3d 382 (2003). Moreover, in interpreting statutes, we note that "[t]he legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed. [Citation omitted.]" *Williamson v. City of Hays*, 275 Kan. 300, 305, 64 P.3d 364 (2003).

K.S.A. 2004 Supp. 75-5217(a) states:

"At any time during release on parole, conditional release or postrelease supervision, the secretary of corrections may issue a warrant for the arrest of a released inmate for violation of any of the conditions of release, or a notice to appear to answer to a charge of violation. Such notice shall be served personally upon the released inmate. The warrant shall authorize any law enforcement officer to arrest and deliver the released inmate to a place as provided by subsection (g). *Any parole officer* may arrest such released inmate without a warrant, or *may*

*deputize any other officer with power of arrest to do so by giving such officer a written arrest and detain order* setting forth that the released inmate, in the judgment of the parole officer, has violated the conditions of the inmate's release." (Emphasis added.)

Thus, under the plain language of K.S.A. 2004 Supp. 75-5217(a), a law enforcement officer is deputized with the authority to arrest an individual who has violated any of the conditions of release when that officer is given the written arrest and detain order.

In the instant case, the officers had not been given a written arrest and detain order at any time prior to arresting Anderson as required by K.S.A. 2004 Supp. 75-5217(a). Nevertheless, the trial court determined that the oral authorization given by Sackhoff was sufficient and that the officers did not have to be in physical possession of a written arrest and detain order when arresting Anderson.

Anderson argues that a strict construction of K.S.A. 2004 Supp. 75-5217(a) does not allow for an oral order to arrest and detain but requires that the order be in writing and in effect before the arrest. On the other hand, the State contends that a reasonable reading of the "arrest and detain" portion of K.S.A. 2004 Supp. 75-5217(a) suggests that although a written order must be "given" to an officer in order to deputize him or her with the power to make the arrest, the officer is not required to actually possess the written order at the time of the arrest.

In order to support its argument on this issue, the State sets forth the following analogy:

"Just as the law 'gives' citizens the right to vote without them having the law in their physical possession, so too does a written arrest and detain order 'give' an officer in the field the authority to arrest an inmate for parole violations without the officer having the actual order in his physical possession at the time of arrest."

Thus, the State's argument is that if citizens can vote without them possessing the law, then by analogy an officer can arrest a parole violator without possessing the arrest and detain order. The State's analogy can be illustrated in the following manner:

| Voter | = | Officer arresting a parole violator |
|---|---|---|
| Possession of law not required | | Actual possession of arrest and detain order not needed |

The strength of this analogy depends on the resemblances and the differences. The resemblances must be essential, and the differences unessential. Does a voter exercising the right to vote resemble an officer arresting a parole violator? No. Although the officer may be a voter, the officer in performing the duties of arresting parole violators does not resemble a voter in any important way. Moreover, are there any important differences? Yes. Although voters do not have to carry the law with them to the voting polls, they are generally required to register prior to voting. If their names are not listed among the properly registered voters, their ballots may be rejected. Moreover, when voters exercise their right to vote, they are engaging in a very important political function. On the other hand, when officers arrest suspects for a crime, the officers are required to have a valid reason or a warrant to justify the arrest. Victims of an improper arrest may have a damage action against the officers for false arrest. Moreover, police officers are engaged in the business of protecting society. There is a difference between removing someone from public office and placing someone in jail. In terms of results produced, there is a significant difference between voters and police officers. Because voting and arresting a parole violator are quite different, the State makes a strained analogy.

Interestingly, to support its view that a deputized officer need not be in possession of the arrest and detain order, the State points to the definition of the word "give." Quoting from Webster's New Collegiate Dictionary 486 (1976), the State defines "give" as follows: "to make a present of;  . . . to grant or bestow by formal action;  . . . to put into the possession of another;  . . . or to commit to another as a trust or responsibility." This definition only serves to support the conclusion that the phrase "by giving such officer a written arrest and detain order," as it is used in K.S.A. 2004 Supp. 75-5217(a), means to put the officer into possession of a written arrest and detain order. We conclude that the officer has the power to arrest a parole violator when that officer has been given the actual written arrest and detain order, not when the officer has been given the oral authorization to arrest the violator. This conclusion is in accord with the language found in *State v.*

*Hearst,* 30 Kan. App. 2d 1052, 1055, 54 P.3d 518 (2002), that K.S.A. 2001 Supp. 75-5217(a) "requires serving the parolee at the time of arrest with written notice that states the parole violation charges." We note that the relevant language under the current version of the statute, K.S.A. 2004 Supp. 75-5217(a), is identical to the language found in K.S.A. 2001 Supp. 75-5217(a).

We conclude that when the officers attempted to place Anderson into custody, they had no authority to arrest Anderson for the parole violation. As a result, the attempted arrest and later arrest of Anderson were unlawful.

Moreover, the trial court's finding that the officers could detain Anderson past the conclusion of the traffic stop because they had probable cause of the suspected parole violation is erroneous. The detention of Anderson past the conclusion of the initial traffic stop could not be supported by the suspected parole violation as it is not a criminal offense. It is well established that an officer may stop any person in a public place when that officer has reasonable suspicion that such person is committing, has committed, or is about to commit a crime. See K.S.A. 22-2402(1); *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *State v. Pritchett,* 270 Kan. 125, 129, 11 P.3d 1125 (2000). Nevertheless, as Anderson points out, a parole violation is not a crime under Kansas law. See *State v. Sullivan,* 17 Kan. App. 2d 771, 773, 844 P.2d 741 (1993) (recognizing that violation of parole conditions is not classified as criminal offense under Kansas Criminal Code). Therefore, the officers could not use the parole violation to conduct a *Terry* stop and detention.

A similar decision was reached in *United States v. Santillanes,* 848 F.2d 1103 (10th Cir. 1988). There, a detective was with another officer in an airport when he noticed the defendant leave the lobby and boarding area of an airline and enter the main lobby of the airport. The detective recognized the defendant whom he had arrested a month earlier for an offense for which the defendant was under indictment. Although the detective was not aware of the particular terms of the defendant's pretrial release, his impression was that individuals indicted for a felony could not leave the county. In order to determine if the defendant had violated the conditions

of his pretrial release, the detective stopped and questioned him. During a later search, the officers discovered heroin on the defendant's person, and the defendant was arrested.

On appeal, the 10th Circuit Court of Appeals determined that because a violation of conditions of pretrial release was not a crime, such a violation could not provide the basis for the stop of the defendant at the airport. The court stated that at the most, the detective should have reported seeing the defendant at the location in the airport. In concluding that the initial stop of the defendant was invalid, the court stated:

"[S]ince there was no crime involved in the possible departure of [defendant] from the jurisdiction the reason advanced by the Government and the detective for the initial stop was not valid, and the initial pat-down and questions were in violation of [defendant's] rights. There would seem to be no serious question but that [the officer] could have properly made the initial inquiry, 'What are you doing here?', had the [defendant's] stop and participation been voluntary, but it was not." 848 F.2d at 1107.

We find the *Santillanes* holding persuasive. Following the unsuccessful search of Anderson's truck, the only remaining suspicion that the officers had was that Anderson was a parole violator. In focusing on this factor, the trial court stated: "[T]here's probable cause to believe that he's in violation of his parole. But it's really a reasonable suspicion after the traffic stop." Explaining that it was proper for the officers to continue their detention of Anderson, the trial judge declared:

"And I find as a matter of law, the fact that there was no order, detain and arrest—arrest and detain order—excuse me—arrest and detain order in existence at the time of the stop does not make it unreasonable for Officer Padron to have held Mr. Anderson until such an order existed.

"And I'll overrule the motion to suppress based on that."

If Anderson's supposed status as a parole violator does not justify reasonable suspicion, the officers' alleged reasonable suspicion topples like a house of cards. Similar to *Santillanes*, a violation of the conditions of parole does not constitute a crime in Kansas. Therefore, the officers' continued detention of Anderson after his truck had been searched cannot be justified on the ground that the officers suspected Anderson's contact with gang members was a vi-

olation of his parole. Moreover, associating with gang members is not a crime and cannot in and of itself provide reasonable suspicion or probable cause of criminal activity. The officers could have reported this information to Anderson's parole officer. Nevertheless, the arresting officers had no reasonable suspicion of any criminal activity, independent of the alleged parole violation, which was not a crime. Therefore, the officers had no reasonable basis to continue their detention of Anderson after the unsuccessful search of the truck.

Moreover, as Anderson points out in his brief, there was no evidence presented at the hearing to establish that Anderson had violated a special condition of his parole by associating with gang members. Padron indicated that he had never been informed by a parole officer that Anderson was prohibited from associating or being in contact with gang members as a condition of his parole. Padron further indicated that based upon his experience and training, parolees who were gang members should not be around other gang members. Nevertheless, the State never introduced any evidence establishing that as a special condition of *his* parole, Anderson was prohibited from associating with gang members. As stated earlier, the State has the burden of showing the lawfulness of the search and seizure. Without such information, we are unable to conclude that Anderson did in fact violate a special condition of his parole and that the later arrest and detain order was properly issued.

Finally, as discussed above, under K.S.A. 2004 Supp. 75-5217(a), officers have the authority to arrest a parole violator when they are given a written arrest and detain order. Nevertheless, the officers did not have the written arrest and detain order in their possession when they detained Anderson after the traffic stop. Moreover, the written arrest and detain order was not even in existence at the time the officers decided to arrest Anderson. From the above analysis, we may conclude that the officers had no authority to arrest Anderson for the parole violation.

Because the continued detention and arrest of Anderson was unlawful, we determine that the seized drug evidence should be suppressed as "fruit of the poisonous tree." See *Wong Sun v.*

*United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *State v. Epperson*, 237 Kan. 707, 718-19, 703 P.2d 761 (1985).

Reversed.