No. 53,038

STATE OF KANSAS, *Appellant,* v. EDDIE JASO, *Appellee.*

(648 P.2d 1)

Opinion filed July 16, 1982.

*R. Michael Jennings,* assistant district attorney, argued the cause, and *Clark V. Owens,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellant.

*Kiehl Rathbun,* of Wichita, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: This is a search and seizure case which must be viewed in light of the recent decision in *United States v. Ross,* _____ U.S. _____, 72 L.Ed.2d 572, 102 S.Ct. 2157 (decided June 1, 1982). It involves the warrantless search of an automobile and its contents.

The State of Kansas brings this interlocutory appeal from an

order of the district court suppressing certain physical evidence recovered by Wichita police in a warrantless search of a suitcase which was found in a warrantless search of an automobile driven by the defendant. The Court of Appeals, in an unpublished opinion, affirmed the district court order suppressing the contents of the suitcase, but reversed the district court as to the initial search of the automobile. *State v. Jaso*, #53,038 filed February 18, 1982. We granted review of the Court of Appeals decision upon a petition filed by the State. A rather detailed statement of the facts is necessary before turning to the issues involved on appeal.

On May 22, 1980, undercover narcotics detective Kim Brewer of the Wichita police department purchased 100 Quaaludes, pills in tablet form which contain the controlled substance methaqualone (K.S.A. 65-4107[e][1]), from Joseph Espinoza. The purchase was made in the parking lot of the Riverbend Apartments in Wichita. Espinoza had obtained the Quaaludes from an apartment in building #3000 of the apartment complex. Brewer desired to capture Espinoza's supplier and told Espinoza he was interested in purchasing 10,000 more. Espinoza went back to building #3000 and returned shortly with the information that he could furnish 10,000 pills the next day and if Brewer was interested, he should call. Brewer then departed from the apartment complex to set up a further purchase in order to capture Espinoza's suppliers.

Early the next morning Brewer telephoned Espinoza advising that he wanted to buy 10,000 Quaaludes. Espinoza replied that he would contact "his man" and then get back in touch with Brewer. A short time later, Espinoza called and said his man could furnish 10,000 Quaaludes for $20,000.00. Brewer agreed. In subsequent calls, Brewer and Espinoza arranged to complete the transaction later that morning at the parking lot of a shopping center close to the Riverbend Apartments.

Brewer then met with other members of the narcotics section of the Wichita police department and Assistant District Attorney Doug Roth. Brewer informed Roth of the 100 pills he bought from Espinoza the previous evening and the arrangements he had made to buy 10,000 more later that morning, and indicated he might need a search warrant for the apartment from which Espinoza was getting the pills.

A surveillance was set up to determine the apartment from which Espinoza was getting the pills and to assist in the "buy-bust" which Brewer would make at the shopping center and the arrest of Espinoza's suppliers at the apartment building. Assistant District Attorney Roth and Detective Jack Henderson remained at the station to monitor the radio transmissions of the surveillance team. Brewer wore a body-pack radio which would transmit Brewer's conversation with Espinoza. Captain Brown and Lieutenant Fulton would stay in range of Brewer's body-pack. Detectives Trainer and Herbel would maintain stationary surveillance of apartment building #3000. Detectives Meyers and Barnes would be on foot posing as gardeners in front of the apartment building in order to ascertain the apartment number when Espinoza came out with the pills. Other detectives would be in their vehicles in the area to assist if necessary. All the officers were in direct radio communication with each other. These plans were carried out.

Later that morning officers saw Espinoza approach apartment building #3000. Shortly thereafter defendant Eddie Jaso came from the area of building #3000 and proceeded to the parking lot and a blue Monte Carlo automobile parked in the lot. Eddie Jaso then returned from the parking lot carrying a blue suitcase and entered apartment #3003. Espinoza then came out of apartment #3003, got into his car and drove to the shopping center where he met Brewer. Espinoza told Brewer that the pills were being counted and if Brewer could wait until 9:00 o'clock a.m., he would deliver as many as had been counted and let him know about the rest. Brewer agreed. Espinoza then left the parking lot, returning to the Riverbend Apartments where he entered apartment #3003. Shortly thereafter Espinoza emerged from the area of apartment #3003 carrying a full brown grocery sack, got in his car and departed for the shopping center parking lot where he delivered 5,000 Quaaludes, which he had in the sack. He told Brewer that the rest were back at his man's place where three people were counting them and that there were approximately 3,000 more pills. At Brewer's signal, officers of the surveillance team moved in and Espinoza was arrested. Brewer and several other surveillance team members then went to the parking lot of the Riverbend Apartments to wait for the issuance of a search warrant for apartment #3003.

In the meantime Assistant District Attorney Roth and Detective Henderson applied to Judge Robert C. Helsel for a warrant to search apartment #3003 for the rest of the Quaaludes. The warrant was issued. At about the same time Eddie Jaso came out of the apartment area and got into a brown Chevrolet automobile in the parking lot. Another individual, who turned out to be Charles Jaso, Eddie's brother, was in the car. Jaso did not have a blue suitcase with him. Captain Brown, a member of the team, radioed Detective Booth to follow and stop the brown Chevrolet. The surveillance team was advised by radio that Judge Helsel had signed the warrant. Several officers then went to the door of apartment #3003 and knocked. Receiving no response, they shouted that they were police officers and that they had a search warrant. They knocked again and still received no response. The door was then forced open and no one was found inside the apartment. On a table they found a broken white pill they recognized as a Quaalude and covering about one-third of the surface of the table was a white powdery residue. In another room they found another broken Quaalude but there was no blue suitcase in the apartment and they did not find any of the 3,000 pills Espinoza had said were there. The officers then discovered for the first time that the apartment had a back door which had not been under surveillance. Obviously the sellers and the remaining drugs had departed through the rear door.

As the apartment was being entered, Detective Booth stopped the brown Chevrolet after pursuing it at speeds in excess of 50 miles per hour. He removed the occupants, who were identified as the Jaso brothers, and each was arrested, handcuffed and placed in a separate police car. Booth then radioed Lieutenant Fulton that he had stopped the car and had the occupants under arrest. Fulton told him the pills were not in the apartment and directed Booth to search the car. Booth began looking for the missing Quaaludes. He did not know where in the car the drugs might be located and did not know what kind of container the drugs were in. He had not been advised to look for a blue suitcase. In conducting the search of the stopped car, Booth removed the key from the ignition, unlocked the trunk and, finding a blue suitcase, opened it and discovered a large quantity (approximately 2,000) of Quaaludes and other evidence. The blue suitcase was later identified as the one Eddie Jaso carried into the

apartment that morning. Booth did not have a search warrant for the car or the blue suitcase and defendant did not consent to the search.

Defendant Eddie Jaso filed a motion in the trial court to suppress the admission into evidence of both the blue suitcase and its contents. In a pretrial hearing the court found that although there was probable cause to stop and arrest the defendant and his brother, there were no exigent circumstances and that the warrantless search of the car and the suitcase were illegal. The admission in evidence of the suitcase and its contents was suppressed. On appeal by the State, the Court of Appeals found there was probable cause to search the automobile and that search was legal, but held that under *Robbins v. California,* 453 U.S. 420, 69 L.Ed.2d 744, 101 S.Ct. 2841 (1981), the search of the suitcase itself was illegal. The Court of Appeals reversed the trial court as to the suitcase, holding it was admissible in evidence and affirmed the trial court as to the contents of the suitcase (the drugs and other items), holding that the contents were inadmissible. *United States v. Ross* had not been decided when the trial court and the Court of Appeals rendered their decisions and those courts did not have the benefit of the change in the law of search and seizure as wrought by *Ross.* Based upon *Ross* we hold that both the trial court and the Court of Appeals were in error when they ordered any of the evidence suppressed.

In *Ross* the Supreme Court appears to have overruled the decision in *Robbins,* made only a year ago, and has specifically disapproved of some of its opinion in *Arkansas v. Sanders,* 442 U.S. 753, 61 L.Ed.2d 235, 99 S.Ct. 2586 (1979), reverting to the broad automobile exception to the Fourth Amendment's warrant requirement originally established in *Carroll v. United States,* 267 U.S. 132, 69 L.Ed. 543, 45 S.Ct. 280 (1925). In view of the holding in *Ross,* it would serve no useful purpose for us to delve into the history and evolution of the law of search and seizure in vehicle cases as it existed prior to *Ross.* The Supreme Court has thoroughly traced and reviewed its decisions from the time of its opinion in *Carroll.* To repeat what has been said in *Ross* would add nothing to this opinion. Neither is there anything to be gained by a review of our prior Kansas cases on the subject. The decision in *Ross,* however, merits careful consideration. The facts as recited in the opinion were:

"In the evening of November 27, 1978, an informant who had previously proved to be reliable telephoned Detective Marcum of the District of Columbia Police Department and told him that an individual known as 'Bandit' was selling narcotics kept in the trunk of a car parked at 439 Ridge Street. The informant stated that he had just observed 'Bandit' complete a sale and that 'Bandit' had told him that additional narcotics were in the trunk. The informant gave Marcum a detailed description of 'Bandit' and stated that the car was a 'purplish maroon' Chevrolet Malibu with District of Columbia license plates.

"Accompanied by Detective Cassidy and Sergeant Gonzales, Marcum immediately drove to the area and found a maroon Malibu parked in front of 439 Ridge Street. A license check disclosed that the car was registered to Albert Ross; a computer check on Ross revealed that he fit the informant's description and used the alias 'Bandit.' In two passes through the neighborhood the officers did not observe anyone matching the informant's description. To avoid alerting persons on the street, they left the area.

"The officers returned five minutes later and observed the maroon Malibu turning off Ridge Street onto Fourth Street. They pulled alongside the Malibu, noticed that the driver matched the informant's description, and stopped the car. Marcum and Cassidy told the driver — later identified as Albert Ross, the respondent in this action — to get out of the vehicle. While they searched Ross, Sergeant Gonzales discovered a bullet on the car's front seat. He searched the interior of the car and found a pistol in the glove compartment. Ross then was arrested and handcuffed. Detective Cassidy took Ross' keys and opened the trunk, where he found a closed brown paper bag. He opened the bag and discovered a number of glassine bags containing a white powder. Cassidy replaced the bag, closed the trunk, and drove the car to Headquarters.

"At the police station Cassidy thoroughly searched the car. In addition to the 'lunch-type' brown paper bag, Cassidy found in the trunk a zippered red leather pouch. He unzipped the pouch and discovered $3,200 in cash. The police laboratory later determined that the powder in the paper bag was heroin. No warrant was obtained.

"Ross was charged with possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a). Prior to trial, he moved to suppress the heroin found in the paper bag and the currency found in the leather pouch. After an evidentiary hearing, the District Court denied the motion to suppress. The heroin and currency were introduced in evidence at trial and Ross was convicted.

"A three-judge panel of the Court of Appeals reversed the conviction. It held that the police had probable cause to stop and search Ross' car and that, under *Carroll v. United States, supra,* and *Chambers v. Maroney,* 399 U.S. 42, the officers lawfully could search the automobile — including its trunk — without a warrant. The court considered separately, however, the warrantless search of the two containers found in the trunk. On the basis of *Arkansas v. Sanders,* 442 U.S. 753, the court concluded that the constitutionality of a warrantless search of a container found in an automobile depends on whether the owner possesses a reasonable expectation of privacy in its contents. Applying that test, the court held that the warrantless search of the paper bag was valid but the search of the leather pouch was not. The court remanded for a new trial at which the items taken from the paper bag, but not those from the leather pouch, could be admitted.

"The entire Court of Appeals then voted to rehear the case en banc. A majority of the court rejected the panel's conclusion that a distinction of constitutional significance existed between the two containers found in respondent's trunk; it held that the police should not have opened either container without first obtaining a warrant." 102 S.Ct. at 2160-61.

The Supreme Court granted the Government's petition for certiorari, recognizing that considerable confusion had been generated by its decisions in *Robbins* and *Sanders*. In commenting upon the fact that those decisions have resulted in widespread disagreement over their proper interpretation, the court candidly stated:

"There is, however, no dispute among judges about the importance of striving for clarification in this area of the law. For countless vehicles are stopped on highways and public streets every day and our cases demonstrate that it is not uncommon for police officers to have probable cause to believe that contraband may be found in a stopped vehicle. In every such case a conflict is presented between the individual's constitutionally protected interest in privacy and the public interest in effective law enforcement. No single rule of law can resolve every conflict, but our conviction that clarification is feasible led us to grant the Government's petition for certiorari in this case and to invite the parties to address the question whether the decision in *Robbins* should be reconsidered." 102 S.Ct. at 2161-62.

After tracing its decisions from *Carroll* through *Robbins,* the court reversed the Court of Appeals and remanded the case for further proceedings at the trial level. In its holding the court stated:

"We reaffirm the basic rule of Fourth Amendment jurisprudence stated by Justice Stewart for a unanimous Court in *Mincey v. Arizona,* 437 U.S. 385, 390:
'The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357 (footnotes omitted).'
The exception recognized in *Carroll* is unquestionably one that is 'specifically established and well-delineated.' We hold that the scope of the warrantless search authorized by that exception is no broader and no narrower than a magistrate could legitimately authorize by warrant. *If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."* 102 S.Ct. at 2172. (Emphasis added.)

The court was careful to point out, however, that not every probable cause search of a vehicle will justify the search of all

containers in the vehicle. If the officers have specific knowledge that they are seeking a specific container and that container is discovered in the vehicle there appears to be no justification for a further search of the vehicle or even of the container itself until a warrant has been obtained. Thus the prohibition against a warrantless search of a specific container thought to contain the sought after contraband is still to be distinguished from the authorized search of a vehicle and its contents when the officers only have probable cause to believe that contraband is somewhere in the vehicle. The distinction established in *United States v. Chadwick,* 433 U.S. 1, 53 L.Ed.2d 538, 97 S.Ct. 2476 (1977), involving a footlocker loaded into an automobile and in *Sanders* involving a suspect green suitcase placed in a taxicab appears to remain viable under *Ross.* The court also pointed out that its ruling in *Ross* does not authorize the search of a container found in a vehicle, even though probable cause exists to believe contraband is located in the vehicle, if such container could not possibly contain the sought after contraband. In illustrating this point, the court stated:

"The scope of a warrantless search of an automobile thus is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found. Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase. Probable cause to believe that a container placed in the trunk of a taxi contains contraband or evidence does not justify a search of the entire cab." 102 S. Ct. at 2172.

With the foregoing in mind we turn to the facts concerning Eddie Jaso. In the instant case the police officers knew that Jaso had been an occupant of apartment #3003, that the apartment had just been the source of some 5,000 illegal Quaaludes, that an additional 3,000 were supposedly in the apartment with Jaso and two other people and that Jaso had just been seen departing the scene in a Chevrolet automobile with another person. When the officers entered the apartment pursuant to the search warrant, they found evidence of the illegal drugs but the drugs and other participants in the sale had obviously fled through the back door. It was reasonable to assume that all or some of the drugs had been removed from the apartment to the Chevrolet automobile and the trial court found substantial competent evidence to support a

finding that probable cause existed to believe that the Chevrolet might contain the contraband. We agree as did the Court of Appeals. See *State v. Youngblood*, 220 Kan. 782, 556 P.2d 195 (1976). In addition, there was no specific reason to be searching only for the blue suitcase and the searching officer had no knowledge as to any specific container. Under the holding in *Ross* the search of the Chevrolet and the blue suitcase did not constitute an illegal search and seizure under the Fourth Amendment and both the suitcase and its contents are admissible in a subsequent trial of appellant Jaso.

We hold that when police officers have made a lawful stop of a vehicle and have probable cause to believe that contraband is in the vehicle the officers may search every area of the vehicle and its contents which might reasonably contain the contraband, without the necessity of first obtaining a warrant. As stated in *Ross*, if the police officer has actual probable cause which would authorize the issuance of a warrant by a magistrate or judge, then such probable cause justifies the search of a lawfully stopped vehicle and justifies the search of every part of the vehicle and its contents that may conceal the object of the search. Previous opinions of this court to the contrary are overruled.

The decision of the Court of Appeals is affirmed in part and reversed in part and the decision of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.