NOT DESIGNATED FOR PUBLICATION

No. 112,730

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

AMANDA E. WAGNER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Riley District Court; JOHN F. BOSCH, judge. Opinion filed October 30, 2015.
Affirmed.

*John W. Thurston*, of Addair Thurston, Chtd., of Manhattan, for appellant.

*James W. Garrison*, assistant county attorney, *Barry R. Wilkerson*, county attorney, and *Derek
Schmidt*, attorney general, for appellee.

Before HILL, P.J., PIERRON and ARNOLD-BURGER, JJ.

*Per Curiam*: Amanda E. Wagner led police on a high speed chase through
Manhattan before she abandoned her car and texted a coworker to pick her up. The
coworker picked Wagner up, and she concealed herself in the front passenger seat. While
leaving the area, the coworker encountered the police—who were looking for Wagner—
and told an officer he was lost and needed directions. The officer saw Wagner attempting
to hide in the front seat and asked her, by name, if she was alright. She was then asked to
step from the car, where it became apparent she was intoxicated. She was arrested and
taken to the police station for an intoxilyzer test. In the meantime, her car was located and

1

searched based on the officer's observation of open containers of alcohol in the vehicle and a purse that would provide them with identification. On appeal, she challenges the stop of her coworker's car by police, her arrest for driving under the influence (DUI) which led to her submitting to an intoxilyzer test, and the search of her car. Because the police encounter with the coworker was both based upon reasonable suspicion and voluntary, there was probable cause to believe she was operating under the influence of alcohol, and the search of her vehicle was supported by probable cause and exigent circumstances, we affirm the district court's denial of her motions to suppress.

FACTUAL AND PROCEDURAL HISTORY

One winter evening, the Riley County Police Department received a call reporting a vehicle driving erratically, including swerving and crossing the center line. Police officers located the vehicle and attempted to pull it over. Rather than pulling over, the car fled, leading police on a chase through Manhattan.

During the chase, the driver committed numerous traffic violations including speeding at speeds in excess of 90 miles per hour, driving the wrong way through a roundabout, driving over curbs, driving after dark with the vehicle's lights off, failing to stop at a stop sign, and failing to use a turn signal. At one point during the chase, the vehicle made a U-turn which gave the officers involved an opportunity to clearly see the driver so that they were later able to identify her.

After some time, the chase was terminated because officers were concerned for public safety. Police lost sight of the vehicle, but it was located again within 30 minutes. When the car was located, it was parked in the parking lot of an apartment complex and was unoccupied. The vehicle was registered to Wagner.

2

Shortly after the vehicle was located, police began a search of the surrounding area in an attempt to locate the driver. While the search was underway a car drove slowly down a dead end road near where the vehicle involved in the chase was parked. Lieutenant Erin Freidline approached the vehicle on foot as it completed a U-turn at the end of the road. The driver of the vehicle, Nicholas Hagnauer, rolled down the window as Freidline approached and told the officer he was lost and wanted to know how to get out of the area. As Freidline got closer to the vehicle she saw a woman curled up on the passenger seat. Suspecting it might be the woman they were looking for and to whom the vehicle was registered, she said, "Amanda, are you ok?" The passenger raised her head and made eye contact with Freidline. At that point, Freidline asked the driver to shut off the car.

After she made contact with Hagnauer, additional officers came to assist Freidline. One of the officers was Officer Adam Peterson. Peterson had been involved in the car chase and had seen the driver of the car. As a result, he was able to identify the woman in the passenger seat as the driver of the car involved in the chase, Wagner.

As Hagnauer would testify at the suppression hearing, he was a coworker of Wagner's who had known her for about 2 1/2 years. She sent a text message to him asking him to give her a ride home because "[s]he couldn't drive" because she was "too drunk." She also mentioned that she was running from the police. He confirmed that when he picked her up she was drunk. He stated he had seen her sober in the past. He estimated that she was "fairly" drunk, a 7 or 8 on a scale of 1 to 10. The police asked him that evening if Wagner appeared drunk to him, and Hagnauer told them that she did.

Peterson asked Wagner to get out of the car. As she got out, Peterson noticed that she was unsteady, used the vehicle for assistance, smelled strongly of alcohol, and had red bloodshot eyes. When Peterson began speaking to Wagner, he also noticed her speech

3

was slurred. Peterson arrested Wagner without performing any field sobriety tests and took her to jail.

After Wagner was arrested, police conducted a full search of her car. The search turned up open containers of alcohol, Wagner's driver's license, and a small amount of marijuana.

Prior to trial, Wagner filed three motions to suppress. The first motion sought suppression of all evidence gathered out of the stop of Hagnauer's vehicle. The second was a motion to suppress for lack of probable cause to arrest her. The third was a motion to suppress evidence gathered during the search of her vehicle. The district court denied all three motions.

Wagner proceeded to a bench trial at which she stipulated to the facts and was found guilty of fleeing and eluding, DUI, circumvention of an ignition interlock device, possession of marijuana, and transportation of liquor in an open container.

On appeal, Wagner challenges the denial of each of her motions to suppress. After setting forth our standard of review, we will examine each in turn.

When reviewing a district court's denial of a motion to suppress, appellate courts utilize a bifurcated standard. Appellate courts review district courts' factual findings to determine whether they are supported by substantial competent evidence. In making this determination, appellate courts do not reweigh evidence or asses the credibility of witnesses. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014). Substantial competent evidence "is that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can be reasonably resolved." *State v. Sharp*, 289 Kan. 72, 88, 210 P.3d 590 (2009). The ultimate legal conclusions drawn from the application of the law to the facts are reviewed de novo. *Reiss*, 299 Kan. at 296.

4

Wagner moved to suppress all evidence obtained as a result of the stop of Hagnauer's car because she believed the police lacked reasonable suspicion to conduct the stop. She renews this argument on appeal. The State responds with two arguments. First, the State contends that, if the officer's conduct resulted in a stop, then the police had reasonable suspicion so that the stop was legal. Second, the State argues the issue of suspicion is irrelevant because the encounter between Freidline and Hagnauer was voluntary.

Both the Fourth Amendment to the United States Constitution and §15 of the Kansas Constitution Bill of Rights protect citizens from unreasonable searches and seizures. Courts have interpreted this protection as requiring police to have some minimum level of reasonableness or articulable suspicion before they engage citizens in involuntary encounters, because such interactions amount to seizures. *State v. Parker*, 282 Kan. 584, 588, 147 P.3d 115 (2006). The exact level of suspicion required to initiate an encounter varies based upon the type of interaction taking place.

Courts have distinguished between four different types of law enforcement-citizen encounters:  voluntary encounters, investigatory detentions or *Terry* stops, public safety stops, and arrests. 282 Kan. at 588. Voluntary encounters are unique from the other three because police can engage a citizen in a voluntary encounter without first having any suspicion that the citizen has committed, is, or is planning on committing a crime (or in the case of public safety stops, without suspicion that the person or vehicle poses a public safety risk) because the citizen freely consents to the interaction. 282 Kan. at 588. An officer may engage a citizen in a short, investigatory detention or stop if the officer has "'prior knowledge of facts or observe[s] conduct of a person which causes the officer to reasonably suspect that such person is committing, has committed, or is about to commit a crime.'" *State v. Epperson*, 237 Kan. 707, 711, 703 P.2d 761 (1985). When an officer

5

stops a moving vehicle, the resulting traffic stop is viewed as an investigatory detention. *State v. Thompson*, 284 Kan. 763, 773, 166 P.3d 1015 (2007).

*The encounter between police and Hagnauer was based upon reasonable suspicion.*

After hearing arguments on Wagner's motion to suppress, the district court determined that a stop had occurred and that the motion to suppress evidence gathered out of that stop should be denied because the police had reasonable suspicion for the stop. As discussed above, police must have some minimum level of reasonableness or articulable suspicion before they engage a citizen in an involuntary encounter, because such interactions amount to seizures. *Thompson*, 284 Kan. at 772-73. The exact level of suspicion required to initiate an encounter varies based upon the type of interaction taking place. 284 Kan. at 772. Traffic stops are generally viewed as investigatory detentions and require officers to have reasonable suspicion that a crime has been, is being, or will be committed at the time the stop is initiated. 284 Kan. at 773.

Although reasonable suspicion is not a high bar, it does require an officer to articulate "[s]omething more than an unparticularized suspicion or hunch." *State v. DeMarco*, 263 Kan. 727, 735, 952 P.2d 1276 (1998). To determine whether reasonable suspicion existed, a court looks at the totality of the circumstances, considering both the quantity and quality of the information an officer possessed, at the time he or she initiated contact, to see whether the officer had "''a particularized and objective basis" for suspecting the person stopped of criminal activity.''' 263 Kan. at 735. However, we do view the evidence in light of a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances. 263 Kan. at 735. Reasonable suspicion represents a "'minimal level of objective justification'" which is "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989). Whether reasonable suspicion exists is a question of law. *State v. Moore*, 283 Kan. 344, 350, 154 P.3d 1 (2007).

Here, at the hearing on the motion to suppress, Freidline testified that she was suspicious of the vehicle because "it just—it was traveling slowly. Due to the construction area it just didn't seem to fit. It was the one and only vehicle in the amount of time that I had been there that had traveled down that street, and it just raised my suspicion about it." The officer also testified that she had been involved in fleeing and eluding cases before where the driver had abandoned the vehicle and had someone pick him or her up. Because it was a cold evening, she was concerned that that driver was doing just that. Wagner's car was located in the parking lot of an existing apartment building approximately 100 yards from where Hagnauer was stopped. So it would not be unusual for her to call someone to pick her up in the vicinity. This was the only car in the vicinity where officers believed Wagner was hiding and were in fact actively searching for her, it was driving slowly, and it drove into an area that dead ended into a dirt road. We agree with the district court that Freidline had a reasonable basis to believe that Wagner may be concealed in the car. Accordingly, the district court's decision denying the motion to suppress is affirmed.

*Even if there were not reasonable grounds to stop the vehicle, the encounter between police and Hagnauer was voluntary.*

Here, the district court arrived at the conclusion that a stop had occurred, citing evidence that Hagnauer was "[f]lagged down by an officer. The individual testified he wasn't going to leave, and there was an officer in front of him that he would have had to drive over if he had tried to leave, and he wasn't going to do that." Although the State did not cross-appeal on this issue, it did argue the voluntariness of the stop as an alternative basis to support the district court's ruling.

Freidline testified that she was on foot in the area near where Wagner's car had been found when a dark-colored vehicle drove slowly past her, hit the point where the road dead ended into the construction site, then made a U-turn to come back toward her.

7

Freidline approached the vehicle after it completed its turn. As Freidline approached, the driver of the vehicle, Hagnauer, rolled down his window, told her he was lost, and asked for directions.

Hagnauer's testimony was substantially the same as Freidline's testimony. He testified that he was completing a U-turn when an officer approached his vehicle on foot. As the officer approached the car, Hagnauer rolled down his window and told her he was lost and needed directions.

Neither party to the alleged stop testified that Hagnauer was, as the district court said, "flagged down." One officer testified that he wrote in his report that Freidline "waved the car down," but then indicated that was a figure of speech and he did not actually see Freidline do anything other than approach the car. Accordingly, this factual finding by the district court was not justified by the evidence.

The Kansas Supreme Court has recognized a number of factors to look at when determining whether an interaction is a voluntary encounter or an investigatory detention.

> "This nonexhaustive and nonexclusive list includes: the presence of more than one officer, the display of a weapon, physical contact by the officer, use of a commanding tone of voice, activation of sirens or flashers, a command to halt or to approach, and an attempt to control the ability to flee." *State v. McGinnis*, 290 Kan. 547, 553, 233 P.3d 246 (2010).

When evaluating the presence or absence of these factors in a given case, the court has instructed that the analysis should not be rigid. Instead, courts should look at the totality of the circumstances, recognizing that no one factor alone is determinative, although some factors may be more indicative of an involuntary encounter than others. 290 Kan. at 553. The key question is whether a reasonable person, under the circumstances, would

8

feel free to refuse the officer's request or end the encounter. Where an encounter is initiated through the use of physical force or an overt show of authority it is appropriate to conclude that a stop has occurred. 290 Kan. at 552.

Here, Freidline made no show of authority; she did not utilize lights or sirens to effectuate the stop; Freidline did not yell at or even orally ask Hagnauer to stop; she did not wave the car down or otherwise signal the driver to stop; Freidline approached the vehicle alone while no other officers were in the immediate vicinity; and Freidline did not utilize her weapon to force the car to stop. In short, none of the factors the Kansas Supreme Court has provided for guidance in determining that a stop occurred were present in this case. The only evidence contained in the record that a stop occurred is Hagnauer's testimony that Freidline was standing in the road in front of him. See *McGinnis*, 290 Kan. at 560 (fact that officer's car appeared to be blocking defendant, not determinative, when defendant could have maneuvered around it). Here, the only thing standing between Hagnauer and the open road was one female officer on foot. If the court in *McGinnis* found that an officer and his car were an insufficient barrier to give rise to the finding of a stop, it would be hard to convincingly argue a stop occurred based on the facts here. Evidence that this was a stop is further diminished by Hagnauer's testimony that, contemporaneously with Freidline approaching the car, Hagnauer rolled down his window to ask her for directions. This fact points to the stop actually being a mutual, voluntary encounter.

Even if Hagnauer truly believed that he had no choice but to stop when Freidline approached him, his subjective belief is somewhat irrelevant. The crucial question in evaluating whether a stop has occurred and a person has been seized is not whether he or she subjectively felt free to leave, but whether a reasonable person in his or her situation would have felt free not to engage with the officer. Courts have consistently held that "a seizure does not occur simply because a police officer approaches an individual . . . . 'Only when the officer, by means of physical force or show of authority, has in some way

9

restrained the liberty of a citizen may we conclude that a "seizure" has occurred.'" *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991). Accordingly, we agree with the State that even if there were not reasonable grounds to stop the vehicle, the encounter between police and Hagnauer was nevertheless voluntary.

PROBABLE CAUSE FOR WAGNER'S ARREST

Wagner next contends that the police lacked probable cause to arrest her for driving under the influence of alcohol. Consequently, she contends, there was no basis to request a breath test and the evidence of the results should be suppressed.

Prior to July 1, 2013, the law was clear. A person was required to be lawfully under arrest for an alcohol or drug related offense before an arresting officer is authorized to request a test of breath, blood, or urine to determine the presence of alcohol or drugs. See *Sloop v. Kansas Dept. of Revenue*, 296 Kan. 13, 18-19, 290 P.3d 555 (2012). This was based on the clear language of K.S.A. 2008 Supp. 8-1001(b)(1)(A) at the time *Sloop* was decided, which required that the driver be under arrest for DUI at the time the request was made. In response to *Sloop*, the legislature amended K.S.A. 8-1001(b)(1)(A) to provide in pertinent part:

> "(b) A law enforcement officer shall request a person to submit to a test or tests deemed consented to under subsection (a): (1) If, *at the time of the request*, the officer has reasonable grounds to believe the person was operating or attempting to operate a vehicle while under the influence of alcohol or drugs, or both, . . . and one of the following conditions exists: (A) The person has been arrested or otherwise taken into custody for any *violation of any state statute*, *county resolution or city ordinance* . . . ."
> L. 2013, ch. 122, sec. 2.

To be lawful, a warrantless arrest must be supported by probable cause. 296 Kan. at 20. Probable cause is a higher burden of proof than reasonable suspicion, but it is less

10

exacting than the standard of proof required for a criminal conviction. 296 Kan. at 20. Probable cause exists when "'"the facts and circumstances within their [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.'" 296 Kan. at 21.

Immediately after Wagner stepped from Hagnauer's car, she was handcuffed and placed in his patrol vehicle and transported to jail. The arresting officer testified that because Wagner had already fled earlier both in her vehicle and on foot, he did not want to have to chase her down again. The officer clearly had probable cause to believe Wagner had violated the state's fleeing and eluding statute. The car involved in the police chase was found abandoned and registered to her. The same officer who had been involved in the car chase and had seen the driver of the car identified Wagner at the scene. It did not take long to also develop reasonable grounds to believe she was under the influence of alcohol or drugs. He did not have Wagner perform any field sobriety tests. Wagner contends because of the lack of such testing, that police lacked probable cause to arrest her for DUI and request a breath test.

While field sobriety testing is useful for establishing probable cause that a driver is under the influence of alcohol, it is just one tool that officers use to determine whether a driver is capable of driving safely. See *State v. Huff*, 33 Kan. App. 2d 942, 945, 111 P.3d 659 (2005). Field sobriety testing, however, is not necessary to establish probable cause. 33 Kan. App. 2d at 945. A probable cause determination is made based on the totality of the circumstances. *Sloop*, 296 Kan. at 20. For instance, in *Huff*, this court found probable cause existed based upon Huff's "speeding and driving off the roadway, his slurred speech, bloodshot eyes, fumbling to find his drivers license, and odor of alcohol." 33 Kan. App. 2d at 945-46.

11

We have no hesitation finding that Wagner was lawfully arrested and was subsequently lawfully requested to take a breath test. Well before the time she was requested to take a breath test, officers had established reasonable grounds to believe she was operating or attempting to operate a vehicle while under the influence of alcohol. Police observed a long list of factors that gave rise to probable cause that Wagner was DUI. At the hearing on the motion to suppress, police testified that they were alerted to her driving due to independent reports that the vehicle was driving erratically, swerving and crossing the center line. The officers then witnessed erratic driving that included failing to stop for emergency vehicles displaying flashing lights and sirens, speeding in excess of 90 miles per hour, driving at night without headlights, driving the wrong way through a roundabout, failure to stop at a stop sign, and failure to use a turn signal. Her driving caused such a danger to the public that police elected to call off the pursuit in hopes she would at least slow down and turn her lights on if the police were no longer following her. When police finally made contact with Wagner, they noticed she had trouble getting out of the car—using the vehicle to steady herself, smelled strongly of intoxicants, had red bloodshot eyes, and her speech was slurred. Once in the officer's vehicle, she fell asleep. Hagnauer, who had known her for over 2 years and picked her up following her text that evening, told officers at the scene that she appeared drunk. He corroborated the officers' testimony that Wagner's speech was slurred, she was "wobbly," "[a] little bit confused," and she appeared drunk.

The totality of the circumstances provide substantial competent evidence that the police had probable cause to arrest Wagner and request that she take a breath test. Accordingly, the district court's decision is affirmed.

Wagner contends that the district court erred when it denied her motion to suppress all evidence obtained from the warrantless search of her vehicle, because the search was invalid as a search incident to arrest.

The Fourth Amendment to the United States Constitution protects citizens from unreasonable searches and seizures by police. Whether a search is unreasonable depends entirely on the circumstances surrounding the search—a search that would generally be impermissible without a warrant may be allowed based on an exception to the Fourth Amendment. *State v. Sanchez-Loredo*, 294 Kan. 50, 55, 272 P.3d 34 (2012). The exceptions recognized in Kansas include:  "'consent; search incident to a lawful arrest; stop and frisk; probable cause plus exigent circumstances; the emergency doctrine; inventory searches; plain view or feel; and administrative searches of closely regulated businesses.'" 294 Kan. at 55.

Wagner challenges the validity of the search the police conducted of her vehicle on the theory that it was not a lawful search incident to arrest. But the State has never argued this was a search incident to arrest. The district court did not find it was a search incident to an arrest, but instead focused on its constitutionality based upon the plain view exception. So there is no need to address whether this was a valid search incident to an arrest, and our analysis could end there. However, on appeal, the parties do address the applicability of the plain view doctrine, so we will briefly discuss the applicability of this exception to the warrant requirement.

The State has argued that the search was justified under two separate exceptions: plain view and the automobile exception. Under the plain view exception, "'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they

may seize it without a warrant.'" *State v. Wonders*, 263 Kan. 582, 590, 952 P.2d 1351 (1998). The automobile exception has developed as a specific instance in which a warrantless search will be allowed under the probable cause plus exigent circumstances exception. *Sanchez-Loredo*, 294 Kan. at 56. Under this exception, police are justified in searching a vehicle when they have probable cause to believe the vehicle contains contraband or evidence of a crime. 294 Kan. at 56-57. This is regardless of whether the vehicle or its occupants are already in police custody. 294 Kan. at 56-57. The automobile exception is the broader of the two exceptions, requiring only probable cause, and fully supports the search that took place here, so we will discuss and apply it to the search of Wagner's vehicle.

The first step in the analysis of whether a search is valid under the automobile exception is to determine whether there was probable cause that evidence of a crime or contraband would be found in the vehicle searched. Probable cause exists "when the facts and circumstances within a law enforcement officer's knowledge . . . are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been or is being committed." *State v. Fitzgerald*, 286 Kan. 1124, 1128, 192 P.3d 171 (2008). Here, at the time of the search, police knew Wagner's vehicle was the vehicle that had been involved in police chase. Police officers approached the vehicle, looked through the windows, and observed open containers of alcohol. With the driver's erratic and reckless driving, the bottles of alcohol—whether empty or full—could be evidence in a DUI investigation or evidence of the separate crime of transporting an open container. Although Wagner argues that the open containers could not be the basis for probable cause because the officers did not know if there was liquid in them, whether the officers saw liquid in the bottles before entering the vehicle simply goes to the quality of the evidence for a subsequent conviction for transporting an open container. It does not detract from a determination that there was probable cause to believe that the bottles were evidence of a DUI or a transporting an open container charge. They also observed a

14

purse, which could reveal evidence of the identity and location of the person driving the abandoned car that had fled from police.

Looking at the totality of the circumstances, the record clearly supports the district court's finding that the police had probable cause to believe they would find evidence of a crime in Wagner's car at the time they initiated the search.

The second issue to address is the scope of the search. Once police have probable cause to search a vehicle, the search is limited only by the nature of the evidence police hope to find. *State v. Jaso*, 231 Kan. 614, 621, 648 P.2d 1 (1982). Police are justified in searching all parts of the car and containers found therein, in which there is probable cause to believe evidence may be found. So, for instance, "'probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase.'" 231 Kan. at 621. Here, police testified that they were looking for evidence related to the DUI charge as well as evidence related to the flee and elude charge, such as a driver's license or other evidence that Wagner was the driver of the vehicle. The search for evidence related to driver identification opened essentially the entire vehicle and all containers therein to search.

Substantial competent evidence supported the district court's determination that police had probable cause to conduct a search of Wagner's vehicle under the automobile exception. The district court's denial of the motion to suppress is, therefore, affirmed.

Affirmed.

15